UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RUBY MAES,

        Plaintiff,

      v.                                Case No.: 1:12-CV-01250 KG/ACT

CITY OF ESPAÑOLA, a municipal
corporation; LEO MONTOYA,
former Chief of Police for the City
of Española; and CHRISTIAN LOPEZ,
former Lieutenant with the City of
Española Police Department,

        Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

      This matter comes before the Court on Defendants' Motion for Summary Judgment, filed on June 12, 2013. (Doc. 27). On June 26, 2013, Plaintiff filed a Response in Opposition to Defendants' Motion for Summary Judgment. (Doc. 29). On July 11, 2013, Defendants filed a reply. (Doc. 34). For the following reasons, Defendants' Motion for Summary Judgment is denied.

*I. Background*

      A.  *Plaintiff's Complaint for Damages Arising from Violation of Americans with Disabilities Act (Doc. 1-1)*

      On October 10, 2012, Plaintiff filed the Complaint in the First Judicial District Court, County of Rio Arriba, State of New Mexico. (Doc. 1-1). Plaintiff's Complaint contains two Counts: Count I, alleging violations of the Americans with Disabilities Act (ADA) for refusal to accommodate a disability and wrongful discharge; and Count II, alleging violations of the New

Mexico Human Rights Act (NMHRA) for refusal to accommodate a handicap and wrongful termination. Defendants are Plaintiff's former employer the City of Española; Plaintiff's former supervisor Christian Lopez; and Leo Montoya, Chief of Police of the City of Española. On December 3, 2012, Defendants removed the case to this Court. (Doc. 1).

B. *Defendants' Motion for Summary Judgment*

Defendants move for summary judgment on Counts I and II. Defendants argue that: (1) Plaintiff's claim under the ADA for refusal to accommodate a disability must fail because Plaintiff does not have an ADA protected disability; (2) Plaintiff cannot show that she was constructively discharged under the ADA; and (3) for the same reasons as stated above, Plaintiff's NMHRA claims fail as well.

C. *Summary of Material Facts*

Defendant City of Española operates the City of Española Detention Facility (the Detention Facility). The Detention Facility requires security coverage by correctional officers twenty-four hours per day, seven days per week. (Doc. 28-1) at 3. To provide this coverage, correctional officers work either a twelve-hour day shift, 6:00 a.m. to 6:00 p.m., or a twelve-hour graveyard shift, 6:00 p.m. to 6:00 a.m. (Doc. 29-1) at 12. Additionally, the Detention Facility requires that correctional officers remain on "standby" on a rotational basis for periods of one week during which time they may be called in to cover any shift if someone is absent or in case of an emergency. (Doc. 28-1) at 3. From August 2008 until April 2011, Defendant City of Española employed Plaintiff as a correctional officer at the Detention Facility. (Doc. 29-5) at 2.

In 2000 or 2001, Plaintiff began experiencing serious insomnia and migraine headaches. (Doc. 29-5) at 1. In 2010, Plaintiff's physician, Murray Ryan, M.D., diagnosed her with depression. (Doc. 28-1) at 24. Dr. Ryan stated that a combination of Plaintiff's depression and

working the graveyard shift "caused her a number of medical problems including severe insomnia, migraine headaches, and much worsened depression." *Id.* Plaintiff's severe insomnia and migraine headaches were triggered if she worked the graveyard shift past 12:00 a.m. *Id.*; (Doc. 29-1) at 6-7. For that reason, Dr. Ryan advised Plaintiff against working any sustained period of graveyard shifts. (Doc. 28-1) at 24. Dr. Ryan further warned Plaintiff that experiencing a severe migraine headache with her sleep disorder could result in serious medical events including an aneurysm. (Doc. 29-2) at 3; (Doc 29-5) at 2.

Between 2008 and February 2011, Ted Garcia served as the director of the Detention Facility and supervised Plaintiff. (Doc. 29-1) at 1. On November 16, 2010, Dr. Ryan wrote a medical note to Mr. Garcia stating that "Ruby Maes suffers from chronic insomnia and severe migraines. She would not tolerate full/graveyard type shift work." *Id.* at 8. Additionally, Plaintiff presented Mr. Garcia with information about the medications that she took for her severe insomnia and migraine headaches. *Id.* at 1. Mr. Garcia states that he accommodated Plaintiff's "disability" by not assigning her to the graveyard shift except occasionally when she would work until 12:00 a.m. or slightly past 12:00 a.m. *Id.* In addition, Mr. Garcia reported that Plaintiff was "a very good worker and had very good job performance reviews." *Id.* In February 2011, Mr. Garcia's employment ended as the director of the Detention Facility. *Id.*

On February 15, 2011, Defendant Lopez replaced Mr. Garcia as the director of the Detention Facility. (Doc. 29-5) at 2. In late February 2011, Plaintiff advised Defendant Lopez of her severe insomnia and migraine headaches. *Id.* Additionally, Defendant Lopez was aware of Dr. Ryan's medical note written November 16, 2010, explaining Plaintiff's medical conditions and inability to work graveyard shifts. (Doc. 29-3) at 5. Defendant Lopez was aware of Plaintiff's medical conditions when, on February 28, 2011, he released a work schedule for

March 5, 2011 through April 1, 2011. (Doc. 29-1) at 12. Defendant Lopez assigned Plaintiff to

work fourteen graveyard shifts during that period. *Id.* Defendant Lopez states that he scheduled

Plaintiff to work the graveyard shifts because of other employees' concerns that Plaintiff was

working only day shifts. (Doc. 28-1) at 5-6. On March 1, 2011, Plaintiff wrote a letter to

Defendant Lopez informing him that she could not work the graveyard shifts because of her

extreme insomnia and migraine headaches and attached a note from Dr. Ryan to that effect.

(Doc. 29-2) at 7. On March 2, 2011, Defendant Lopez amended the work schedule, assigning

Plaintiff to work only day shifts. (Doc. 28-1) at 9-10. On March 28 2011, Defendant Lopez

placed Plaintiff on the standby schedule for the week of April 2, 2011 through April 8, 2011. *Id.*

at 10-12.

      On April 6, 2011, during the week in which Plaintiff was scheduled for standby, a

correctional officer called in sick for a graveyard shift. (Doc. 28-1) at 21. At 5:00 p.m., a

correctional officer called Plaintiff to cover the graveyard shift starting at 6:00 p.m. *Id.* Shortly

thereafter, Plaintiff told Defendant Lopez that she could not work past 12:00 a.m. because of her

extreme insomnia and migraine headaches. *Id.* Defendant Lopez responded that she would have

to find somebody to cover the shift for her. *Id.* When Plaintiff asked Defendant Lopez what she

should do if she was unable to find a replacement, he responded, "That's your problem." *Id.*

Plaintiff unsuccessfully attempted to contact two co-workers to substitute for her. (Doc. 29-1) at

18-19.

      Plaintiff reported for the standby shift at 6:00 p.m. (Doc. 28-1) at 17. While at work that

night, Plaintiff called Defendant Lopez to inform him that she was unable to find a replacement,

but he did not answer her call. (Doc. 29-4) at 11. Plaintiff then called Defendant Montoya,

Defendant Lopez's supervisor, and explained that she was unable to find a replacement and

could not contact Defendant Lopez. *Id.* She also advised Defendant Montoya about her medical condition and need to be excused from working past 12:00 a.m. *Id.* Defendant Montoya responded that he did not want to get involved in Defendant Lopez's decisions. *Id.*

After Plaintiff spoke with Defendant Montoya, a co-worker informed Plaintiff that the Detention Facility was conducting three prisoner transports that night and that she was required to stay on duty during the transports. (Doc. 29-4) at 6-8. According to Plaintiff, the transports would have required her to be on duty until nearly 6:00 a.m. *Id.*; (Doc. 29-5) at 3.  Plaintiff felt that this would require her to violate Dr. Ryan's orders and threaten her health. (Doc. 29-5) at 3. At 7:10 p.m., Plaintiff left the Detention Facility. (Doc. 28-1) at 17. Plaintiff explains that she decided to leave at 7:10 p.m. rather than wait until 12:00 a.m. because she felt it was better to leave before the transports began than to leave while they were underway. *Id.*

On April 7, 2011, a City of Española employee, Joaquin Maestas, called Plaintiff and requested that she come in to work to speak with him. (Doc. 29-4) at 17. Plaintiff arrived at the Detention Facility and spoke with Stephanie Martinez, an employee of the City of Española Human Resources Department. *Id.* at 17-18. According to Plaintiff, Ms. Martinez implied that Plaintiff had quit her job the night before and stated, "Well, you quit last night." *Id.* Plaintiff responded that she had not quit. *Id.* Ms. Martinez then telephoned Defendant Lopez. *Id.* While on the phone with Defendant Lopez, Ms. Martinez looked at Plaintiff and stated, "Well, I have a letter that we have that you can just sign it, of resignation." *Id.* Plaintiff states that she felt like she was fired. *Id.* Plaintiff declined to sign the letter. *Id.* It is unclear whether Plaintiff met with Mr. Maestas after speaking with Ms. Martinez.

On April 8, 2011, Plaintiff submitted a letter of resignation. (Doc. 28-1) at 31. In the letter, Plaintiff states that "[t]he stress and, what I consider mental abuse, therefore leave me no

other option but to respectfully submit my letter or resignation, effective immediately." *Id.* According to Defendant Lopez, he probably would not have fired Plaintiff over the April 6, 2011 incident, but he would have reprimanded her. *Id.* at 13.

## II. Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).[1] When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non- moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

## III. Discussion

### A.  Plaintiff's Claim for Discrimination Under the ADA

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability" in the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a) (2000) (amended 2008). When considering a claim brought under the ADA, the

---

[1] Rule 56 was amended effective December 1, 2010, but the standard for granting summary judgment remains unchanged.

*McDonnell-Douglas* burden shifting framework governs the analysis. *See* 42 U.S.C. § 12112(a); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003). Under that analysis, the plaintiff carries the initial burden of making a *prima facie* showing of discrimination based on disability. *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003). If the plaintiff makes this *prima facie* showing, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. *Id.* If the defendant meets this burden, the burden shifts back to the plaintiff to show that the defendant's reason for the adverse employment action was pretextual. *Id.*

To make a *prima facie* showing of discrimination under the ADA, Plaintiff must show that she was: (1) a disabled person within the meaning of the ADA; (2) able to perform the essential job functions with or without reasonable accommodation; and (3) discriminated against by Defendants because of her disability. *Albert v. Smith's Food & Drug Ctr., Inc.*, 356 F.3d 1242, 1249-50 (10th Cir. 2004).

### 1. *Disabled Person Within the Meaning of the ADA*

A person has a disability if she "has a physical or mental impairment that substantially limits one or more ... major life activities." 42 U.S.C. § 12102(1)(A) (2000) (amended 2008); 29 C.F.R. § 1630.2(g) (2011). The ADA Amendments Act of 2008 (ADAAA) rejected the Supreme Court's decision in *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184, 198 (2002), which held that the term "major life activities" referred only to activities of "central importance to most people's daily lives." Pub. L. No. 110–325 § 2(b)(4). Congress stated that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis" and "usually will not require scientific, medical, or statistical analysis." Pub. L. No. 110–325 § 2(b)(5); 29 C.F.R. § 1630.2(j)(v). Now, under the ADAAA, "major life activities

7

include, but are not limited to . . . sleeping, . . . and working." 42 U.S.C. § 12102(2)(A).  As well,

an impairment that "substantially limits one major life activity need not limit other major life

activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C). Finally, an impairment

that is "episodic or in remission is a disability if it would substantially limit a major life activity

when active." 42 U.S.C. § 12102(4)(D). "If an individual is substantially limited in any other

major life activity, no determination should be made as to whether the individual is substantially

limited in working." *EEOC v. Heartway Corp.*, 466 F.3d 1156, 1162 n. 5 (10th Cir. 2006)

(internal quotation marks omitted)).

Plaintiff contends that her extreme insomnia and migraine headaches limit her major life

activities of sleeping and working. If Plaintiff is substantially limited in either major life activity,

then she meets the first prong of a *prima facie* case of discrimination under the ADA. The Court

will begin by analyzing whether Plaintiff is limited in her ability to sleep.

Defendants argue that the inability to sleep does not substantially limit a major life

activity. The cases that Defendants cite as support, however, were all decided before the

ADAAA. Under the lesser threshold contained in the ADAAA, sleeping is listed as a major life

activity, and numerous courts have held that an inability to sleep constitutes a disability. *See*

*Howard v. Steris, Corp.*, 886 F.Supp.2d 1279, 1291 (M.D. Ala. 2012) (plaintiff limited in ability

to sleep because of obstructive sleep apnea and Graves' Disease had ADA disability); *Shirley v.*

*Integrated Systems Improvement Services*, 2012 WL 3776882 (D. Ariz.) (plaintiff with sleep

apnea and insomnia held to be disabled person under ADA); *Orne v. Christie*, 2013 WL 85171

(E.D. Va.) (plaintiff alleging sleep apnea that affected plaintiff's  ability to sleep and

concentration offered enough facts to establish ADA disability for pleading purposes).

Viewed in a light most favorable to Plaintiff, the evidence shows that Plaintiff's doctor diagnosed her with extreme insomnia and migraine headaches. When active, Plaintiff's conditions interfered with her ability to sleep. A reasonable jury, therefore, could conclude that Plaintiff has a physical or mental impairment that substantially limits the major life activity of sleeping. Plaintiff has presented enough evidence to create a genuine issue of material fact regarding whether she is a disabled person pursuant to that ADA.

2.   *The Ability to Perform Essential Job Functions with or without Reasonable Accommodation*

A "qualified individual with a disability" is someone who can perform the "essential functions" of the job, "with or without reasonable accommodation." 42 U.S.C. § 12111(8). Defendant Lopez and Mr. Garcia both acknowledge that if reasonably accommodated, *i.e.*, not required to work past 12:00 a.m., Plaintiff was able to perform the essential duties of a detention officer. *See* (Doc. 29-4) at 3; (Doc. 29-1) at 1. Plaintiff, therefore, has presented sufficient evidence, when viewed in the light most favorable to her, that she meets the second prong of her *prima facie* case. Thus, general issues of material fact exist as to whether Plaintiff was able to perform the essential job functions of a detention officer without or without reasonable accommodation.

3.   *Discrimination Because of Disability*

Under the ADA, discrimination may include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless "such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A); *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001).

9

Construed in a light most favorable to Plaintiff, the evidence shows that Plaintiff notified Defendants of her extreme insomnia and migraine headaches through a doctor's note, a letter, and verbally alerting them to her conditions. Defendants also were aware that her conditions were triggered if she worked a graveyard shift past 12:00 a.m. Aware of Plaintiff's conditions, Defendant Lopez scheduled Plaintiff for standby, including the possibility that Plaintiff would be called to cover graveyard shifts. On April 6, 2011, Plaintiff was called to fill in a graveyard shift scheduled to end at 6:00 a.m. After she arrived at work, Plaintiff asked Defendant Lopez if she could be excused from working the graveyard shift. Defendant Lopez refused to allow her to leave, required her to find a replacement or work the graveyard shift, and stated that it was not his problem if she was unable to find a replacement. When unable to find a replacement, Plaintiff attempted again to contact Defendant Lopez, but he did not answer her call. Plaintiff then asked Defendant Montoya if she could be excused from working the graveyard shift. Defendant Montoya refused to intervene and allow her to go home.

Based on this evidence, a reasonable jury could determine that Defendants failed to make a reasonable accommodation to Plaintiff's known medical conditions when Defendant Lopez scheduled her for standby and Defendants Lopez and Montoya refused to excuse her from working a graveyard shift on April 6, 2011. Additionally, Defendants do not present evidence that allowing Plaintiff to be excused from working the graveyard shift on April 6, 2011, would have caused them an undue hardship. Plaintiff has put forth evidence that raises a genuine issue of material fact regarding whether Defendants discriminated against Plaintiff because of her disability.

In sum, Plaintiff has made a *prima facie* showing of discrimination based on her disability. Under the *McDonnell-Douglas* burden shifting framework, the burden now shifts to

Defendants to articulate a legitimate nondiscriminatory reason for their employment decision. In both the Motion for Summary Judgment and reply, Defendants do not articulate any legitimate nondiscriminatory reason for their employment decision. Defendants, therefore, fail to carry their burden and are not entitled to summary judgment regarding Plaintiff's claim for discrimination under the ADA.

### B.  Plaintiff's Claim for Constructive Discharge Under the ADA

Constructive discharge occurs when "an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005) (citation omitted). In contrast, "a plaintiff who voluntarily resigns cannot claim that he or she was constructively discharged." *Exum v. U.S. Olympic Comm.,* 389 F.3d 1130, 1135 (10th Cir. 2004). A finding of constructive discharge depends upon whether a reasonable person would view the working conditions as intolerable, not upon the subjective view of the employee. *Id.* Further, to establish constructive discharge "a plaintiff must show that, at the time of [her] resignation, [her] employer did not allow [her] the opportunity to make a free choice regarding [her] employment relationship." *Id.*

Construed in the light most favorable to Plaintiff, the evidence shows that Plaintiff suffered from extreme insomnia and migraine headaches that were triggered if she worked past 12:00 a.m. Additionally, Plaintiff's physician warned her that experiencing a severe migraine could lead to an aneurysm. Plaintiff repeatedly told Defendants Lopez and Montoya that she was unable to work past 12:00 a.m. due to her conditions and presented a physician's note to that effect. Although aware of her inability to work past 12:00 a.m., Defendant Lopez scheduled Plaintiff for standby during the week of April 2, 2011. On April 6, 2011, a co-worker called

Plaintiff to cover a graveyard shift. Plaintiff voiced her concern to Defendants Lopez and Montoya that she was unable to work past 12:00 a.m., but they did not excuse her from working the graveyard shift. After arriving to work, a co-worker informed Plaintiff that the Detention Center was conducting multiple transports that night which would require Plaintiff to remain on duty until 6:00 a.m.

A reasonable jury could find that this evidence shows that Defendants forced Plaintiff to decide between her job, which on April 6, 2011 required her to work until 6:00 a.m., or her health because working until 6:00 a.m. could have caused her to suffered severe insomnia, migraine headache, or possibly an aneurysm. A reasonable jury could also find that reasonable persons faced with this decision would view the working conditions so intolerable that they would feel like they had no other choice but to quit. *See Sturz v. Wisconsin Department of Corrections,* 642 F.Supp.2d 881, 891 (W.D.Wis. 2009) (finding that "[a] reasonable jury could find that plaintiff's conditions were objectively intolerable as a result of defendant's failure to accommodate her ... [because] [a]n employee should not have to choose between her job and her health."); *Miller v. AT & T Network Sys.*, 722 F. Supp. 633, 639 (D. Or. 1989) *aff'd and adopted*, 915 F.2d 1404 (9th Cir. 1990) (holding that there was question of fact for jury whether defendant constructively discharged plaintiff by forcing him to work in environment which threatened his health and safety); *Blickle v. Illinois Dep't of Children & Family Servs.*, 2013 WL 2467651 (N.D. Ill.) (slip op.) ("A jury could find that a reasonable person would resign instead of enduring severe pain to perform his or her job."). Therefore, there is a genuine issue of material fact concerning whether Defendants constructively discharged Plaintiff. Defendants are not entitled to summary judgment on Plaintiff's constructive discharge claim.

### C.  Plaintiff's Claims under the NMHRA

Plaintiff and Defendants agree that the analysis for Plaintiff's claims for discrimination based on a handicap and constructive discharge under the NMHRA is the same as under the ADA. Although the New Mexico Supreme Court has not adopted federal analysis in deciding NMHRA claims, the New Mexico Supreme Court has held that "it is appropriate to rely upon federal adjudication for guidance in analyzing a claim under the [NMHRA]." *Trujillo v. Northern Rio Arriba Electric Coop., Inc.,* 2002-NMSC-004, ¶ 8, 131 N.M. 607. For a claim alleging discrimination on the basis of handicap or medical condition, the New Mexico Supreme Court has noted that "the closest federal counterpart would be the Americans with Disabilities Act." *Id.* The New Mexico Supreme Court, therefore, applies the requirements for a *prima facie* case for discrimination under the ADA to a plaintiff's NMHRA claim of discrimination based on disability. *Id.* Likewise the New Mexico Supreme Court has adopted the same legal standard for a claim of constructive discharge under the NMHRA as the Tenth Circuit Court of Appeals uses for a constructive discharge claim under the ADA. *See, e.g., Gormley v. Coca-Cola Enterprises*, 2005-NMSC-003, ¶ 10, 137 N.M. 192.

Because the analysis of Plaintiff's claims under the NMHRA is the same as the analysis of Plaintiff's similar claims under the ADA, Defendants' motion for summary judgment on Plaintiff's claims under the NMHRA, likewise, is denied

IT IS ORDERED that Defendants Motion for Summary Judgment (Doc. 27) is denied.

UNITED STATES DISTRICT JUDGE

13